UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.G.,<br><br>        Plaintiff,<br><br>    v.<br><br>ANDREW M. SAUL,<br><br>        Defendant. | Case No. 18-cv-02604-NC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 23, 27 |

Plaintiff seeks judicial review of the defendant Commissioner of Social Security Andrew M. Saul's[1] denial of her application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* *See* Dkt. Nos. 26, 29. Plaintiff argues that the Administrative Law Judge failed to properly evaluate the medical record and her subjective complaints. The Court finds that the Administrative Law Judge articulated sufficient reasons for his findings and properly evaluated the medical record. Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

---

[1] On June 4, 2019, the United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security. *See* P.N. 94, 116th Congress (2019). Accordingly, the Court substitutes Saul for the defendant and directs the Clerk of the Court to update the case caption. *See* Fed. R. Civ. P. 25(d).

## I. Background

### A. Procedural History

Plaintiff applied for Title II disability insurance benefits and protectively filed a Title XVI application for supplemental security income on November 16, 2015. *See* Dkt. No. 18 ("AR") at 204–19. She indicated on her application that she had submitted a prior application with the Social Security Administration. AR at 204. An Administrative Law Judge ("ALJ") held a hearing on Plaintiff's application on September 19, 2017. *Id.* at 29–71. The ALJ found that Plaintiff was not disabled and denied her application. *Id.* 12–28. The Social Security Administration Appeals Council denied review. *Id.* at 1–6. Plaintiff seeks judicial review of the ALJ's now-final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Both parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). *See* Dkt. Nos. 10, 13.

### B. Undisputed Facts

#### 1. Non-Medical Evidence

Plaintiff is a homeless 53-year-old woman with a high school education and work experience as a caregiver. *Id.* at 33, 40, 67. She alleges disability beginning March 20, 2016, based on neuropathy, memory loss, diabetes, and arthritis. *Id.* at 33, 253. Plaintiff has not worked since her alleged onset date. *Id.* at 17.

In her functional report dated January 27, 2016, she noted that burning and stiffness in her hands and numbness in her legs limited her ability to work. *Id.* at 260. She also listed problems with sleeping and has difficulty with daily tasks such as dressing, bathing, caring for her hair, shaving, feeding herself, and using the toilet. *Id.* at 261. Plaintiff indicated that she did not prepare her own meals, but also that she spent one hour daily on preparing meals. *Id.* at 262. Plaintiff wrote that she performs "very light" household chores for two hours daily. *Id.* She added that she goes outside daily[2] and travels by walking and using public transportation with the help of a cane. *Id.* Plaintiff also

---

[2] In her functional report, Plaintiff lists her address as homeless. AR 268. Thus, her time spent outside might simply reflect her living situation, not elective activities. *See* AR 263.

indicated that she shopped for oral hygiene products and groceries for two hours twice a month. *Id.* at 262, 264. She stated that she spent time with friends twice a week listening to music, talking, and eating together. *Id.* at 264.

Plaintiff's friend, A. Wiley, completed a third-party report describing her perception of Plaintiff's abilities and habits. *Id.* at 270–77. Wiley's report is substantially identical to Plaintiffs' own report. *Id.*

### 2. Medical Evidence

Plaintiff was diagnosed with right shoulder strain and peripheral neuropathy in 2014. *See* AR 389. Although Plaintiff also complained of leg pain that same year, her doctors found no abnormalities with her leg. *Id.* at 409. A year later, Plaintiff reported improvement in her hand and foot pain. *Id.* at 338. By the end of 2015, x-rays showed swelling consistent with osteomyelitis in her finger. *Id.* at 373. Plaintiff was "well known" to the emergency room department for "similar trivial symptoms." *Id.* at 377.

On January 13, 2016, Dr. Sheila Nouchian noted decreased sensation in Plaintiff's hands and feet, and diminished reflexes in her knees. *Id.* at 412. Plaintiff was discharged from physical therapy shortly after for her failure to comply with the attendance policy. *Id.* at 330.

On February 11, 2016, state agency physician Dr. A. Khong assessed the following manipulative limitations based on Plaintiff's record: "Frequent handling and fingering using [right] and occasional handling and fingering using the [left]. May feel frequently bilaterally." *Id.* at 81. Dr. Khong further noted that x-rays of Plaintiff's left hand did not reveal any arthritis, and "[d]espite her presumed diagnosis of neuropathy due to subjective complaints of pain, records do not indicate any significant functions limitations in the [right] hand." *Id.* at 78. Dr. Khong concluded that Plaintiff could: lift or carry 10 pounds frequently and 20 pounds occasionally; stand or walk for more than six hours in an eight-hour workday; and sit for more than six hours in an eight-hour workday. *Id.* at 80.

On March 26, 2016, Plaintiff sought treatment at the emergency room for hip pain. *Id.* at 479. She also complained of unsteady gait, and stated that she had "a facial droop

and [affected] speech a few months prior to her visit. *Id.* at 480. The physician's assistant processing Plaintiff noted abnormal gait. *Id.* at 479. But, later the same day, Dr. Avinash Patil noted normal, intact gait, normal range of motion and coordination, and 5/5 strength in all four extremities. *Id.* at 481. However, Dr. Patil also noted a positive Romberg sign, indicating neurological dysfunction. *Id.* at 481. Doctors drained a fluid collection on Plaintiff's right thigh. *Id.* at 491. Her discharging physician noted that Plaintiff's CT scan showed evidence of a prior stroke, likely the reason for her neurological deficit. *Id.* at 491. He noted that on discharge Plaintiff "ambulate[d] well and steadily," though "wide based." *Id.* at 491, 494. Additionally, Plaintiff displayed good strength in all extremities after having her hip wound incised and drained. *Id.* at 494.

Dr. Nouchian saw Plaintiff again on April 27, 2016. *Id.* at 496. Dr. Nouchian assessed a "[r]ecent silent left sided lacunar infact[ion]." *Id.* at 498. She also diagnosed Plaintiff with "uncontrolled peripheral neuropathy" with "[w]eakness, unstable gait, numbness and tingling." *Id.* at 496, 498. Dr. Nouchian referred Plaintiff to neurology for her lacunar infarction and neuropathy. *Id.* at 498–99.

On June 22, 2016, Plaintiff saw Dr. Jai-Hyon Rho. Plaintiff complained of "burning, pins and needles, painful neuropathy in [her] hands and feet." *Id.* at 533. Plaintiff's neurological exam showed intact motor and sensory function, as well as "intact casual gait." *Id.* at 534. Dr. Rho encouraged "exercise and weight loss," and recommended Plaintiff be "less sedentary or less vigilant as to her symptoms." *Id.* at 534.

On August 8, 2016, Dr. Nouchian wrote that Plaintiff "reports the condition is getting worse." *Id.* at 538. A few months later, Dr. Nouchian noted "[n]umbness and tingling of hands and feet," but also opined that Plaintiff's "pain is manageable." *Id.* at 551–52.

### 3. ALJ Hearing

On September 19, 2017, the ALJ conducted a hearing to review Plaintiff's disability application. *Id.* at 29. Plaintiff was present and represented by counsel. *Id.* Plaintiff, Dr. Joseph R. Gaeta, a medical expert, and Darlene T. Mcquary, a vocational expert, testified

4

at the hearing. *Id.* at 35, 43, 67.

Plaintiff testified that she had not worked since March 2016. *Id.* at 34. She explained that pain in her hands and legs prevented her from working. *Id.* at 35. She added that lack of sleep, back pain, and trouble with her memory also contributed to her inability to work. *Id.* at 36, 38–39.

The ALJ then inquired whether Plaintiff's case contained mental or purely physical elements. *Id.* at 39. Counsel for Plaintiff replied that the case was primarily physical. *Id.* at 39. The ALJ followed-up with questions about Plaintiff's use of methamphetamines. *Id.* at 40. Plaintiff responded that she no longer used methamphetamines, but did not have any record of the outpatient program she attended. *Id.* at 40–42. The ALJ, citing procedural timelines, declined the offer by Plaintiff's counsel to locate them. *Id.* at 43.

The ALJ next discussed Plaintiff's record with Dr. Gaeta. *Id.* at 15. The ALJ read and summarized selections from the record identified as from June 2016 to July 2017[3] that Dr. Gaeta had not received, including recommendations by a neurologist. *Id.* at 44–49. Plaintiff's counsel declined the ALJ's offer to read additional portions from that portion of the record. *Id.* at 49. After the ALJ's reading, Dr. Gaeta stressed the importance of a neurological exam to assess the impact of Plaintiff's neuropathy and requested clarification on whether a neurologist assessed Plaintiff. *Id.* at 50. Plaintiff stated that she had seen a neurologist, but neither the ALJ, Plaintiff, nor her counsel provided further insight on the neurologist's identity or findings. *Id.* at 50–52.

The ALJ then asked Dr. Gaeta for his opinion on the residual functional capacity profile of someone matching Plaintiff's record. *Id.* at 54. Dr. Gaeta stated that he did not know if he had enough information to provide an RFC. *Id.* He opined that Plaintiff could perform light levels of physical activity based on the physical findings in the record, but "[i]f she ha[d] pain, that's a different issue." *Id.* Dr. Gaeta also opined that Plaintiff did

---

[3] Though the cover sheet identifies the medical records as covering from June 22, 2016 to July 6, 2017, they include an encounter from May 2, 2016, that was entered into the system on November 1, 2016. *Id.* at 532, 543–545.

5

not need any environmental limitations. *Id.*

Counsel for Plaintiff then questioned Dr. Gaeta. *Id.* at 55–56. Counsel asked whether Plaintiff's neuropathy could reasonably cause her pain. *Id.* at 55. Dr. Gaeta acknowledged that neuropathy can be disabling, but that it has to be significant to meet the statutory listing for disability. *Id.* at 55. The doctor emphasized that Plaintiff's neuropathy diagnosis was not substantiated by any neurology report or study. *Id.* at 55.

Plaintiff's counsel next questioned Plaintiff. *Id.* at 57–66. Counsel first asked about her pain. *Id.* at 57. Plaintiff stated that it significantly affected her day and night. *Id.* at 57–58. Plaintiff also stated that she can't move her fingers well, and has trouble grasping objects. *Id.* at 58. She also testified that she had difficulty standing and walking. *Id.* at 61.

Lastly, Plaintiff testified about her living conditions, any issues with daily activities, and her ability to concentrate. *Id.* at 63–64. She testified that she was homeless, relied on churches and food banks for her meals, and struggled bathing, dressing herself, and combing her hair. *Id.* at 64. Plaintiff also stated that she had problems with comprehension, concentration, and her memory. *Id.* at 64. The ALJ and Plaintiff's counsel reviewed the medical record, but agreed that the record did not contain any memory testing. *Id.* at 65–66.

Next, the vocational expert testified. *Id.* at 67–71. The ALJ defined a hypothetical individual with limitations of lifting and carrying 20 pounds occasionally, 10 pound frequently, able to stand, walk, and sit for six hours in an eight-hour day, with no manipulative, communication, environmental, or emotional limits. *Id.* at 67. The ALJ first asked if someone with those limits could complete Plaintiff's prior work. The vocational expert stated that someone with those limitations could not complete Plaintiff's prior work, but could work as a companion, agricultural sorter, or parking lot attendant. *Id.* at 69–70.

### 4. ALJ Decision

To qualify for SSI under the Social Security Act, a claimant alleging disability must be unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 48 U.S.C. § 1382c(a)(3)(A). An ALJ uses a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 416.920(a)(1). If the ALJ finds the claimant disabled or not disabled at one of the steps, the ALJ makes his determination and does not proceed in his evaluation. 20 C.F.R. § 416.920(a)(4).

The ALJ issued his decision on November 27, 2017. AR 12. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 20, 2016, the alleged onset date of her disability. *Id.* at 17. At step two, the ALJ found Plaintiff suffered from four severe impairments: peripheral neuropathy, diabetes mellitus, dysfunction of major joints, and other cerebral degenerations. *Id.* at 17. The ALJ stated that these four impairments significantly limited Plaintiff's ability to perform basic work activities as required by SSR 85–28. *Id.*

At step three, the ALJ found that Plaintiff did not meet the criteria for a listed impairment. *Id.* at 18.

Before proceeding to step four and five, an ALJ must determine the claimant's residual functional capacity. 20 C.F.R. § 416.945(a)(4)(iv). To determine the claimant's residual functional capacity, an ALJ considers all of the claimant's severe impairments collectively. *Id.* § 416.945(a)(2). Here, the ALJ considered Plaintiff's hearing testimony, Dr. Gaeta's hearing testimony, Dr. Khong's report, and the medical record. *Id.* at 18–22. Overall, the ALJ found Plaintiff's alleged physical impairments only partially supported by the record. *Id.* at 19.

Though the ALJ found that Plaintiff's medical impairments "could reasonably be expected to produce the . . . alleged symptoms," he concluded that the record did not support her "contentions regarding [their] severity [], and the related functional restrictions." *Id.* at 19, 22. The ALJ noted that Plaintiff's medical record included "multiple instances of noncompliance with recommended treatment," as well as "multiple normal examinations." *Id.* at 19. As such, the ALJ gave weight to Plaintiff's statements

7

"only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." *Id.* at 19.

The ALJ accorded great weight to the of opinion of Dr. Gaeta, finding the doctor's testimony consistent with the record as a whole, including a lack of physical findings from an examination. *Id.* at 22.

Conversely, the ALJ accorded partial weight to Dr. Khong's opinion. *Id.* The ALJ adopted Dr. Khong's opinion as to Plaintiff's ability to lift or carry, stand or walk, and sit during an eight-hour workday. *Id.* But the ALJ did not adopt the manipulative limitations for Plaintiff's left hand suggested by Dr. Khong. *Id.* Rather, the ALJ adopted Dr. Gaeta's testimony that Plaintiff had no manipulative limitations because Dr. Gaeta's opinion was more consistent with the record. *Id.*

Thus, the ALJ concluded that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)." *Id.* at 18.

At step four, the ALJ found that Plaintiff is unable to perform her past relevant work. *Id.* at 22. The ALJ stated that Plaintiff's former work as a caregiver required the capacity to perform medium work. *Id.* The ALJ relied on the vocational expert's testimony that Plaintiff could not continue to work as a caregiver. *Id.*

At step five, the ALJ determined that Plaintiff could perform other occupations existing in significant numbers in the national economy. *Id.* at 23. The ALJ stated that Plaintiff has a high school education, can communicate in English, and gained transferable skills from her prior employment. *Id.* at 22–23. Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could work as an agriculture sorter, parking lot attendant, or companion. *Id.* at 23. Thus, because Plaintiff could perform other work, the ALJ concluded that Plaintiff was not disabled. *Id.* at 24.

**II.  Legal Standard**

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).

8

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The decision of the Commissioner should only be disturbed if it is not supported by substantial evidence or if it is based on legal error. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Substantial evidence is evidence that a reasonable mind would accept as adequate to support the conclusion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("[It] is more than a mere scintilla but less than a preponderance."). Even when the ALJ commits legal error, the decision must be upheld if the error is harmless. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). However, "[a] reviewing court may not make independent findings based on the evidence before the ALJ to conclude that the ALJ's error was harmless." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006)).

### III. Discussion

Plaintiff argues that the ALJ's decision should be reversed for three reasons: (1) the ALJ improperly credited Dr. Gaeta's opinion over Dr. Khong's opinion; (2) the ALJ improperly rejected Plaintiff's own subjective testimony; and (3) the ALJ failed to discuss lay witness testimony. These three errors, Plaintiff argues, rendered the ALJ's step five analysis inaccurate. The Court addresses each argument in turn.

#### A. Whether the ALJ Improperly Weighed the Medical Opinions

"The ALJ is responsible for resolving conflicts in the medical record." *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1164 (9th Cir. 2008). Ninth Circuit precedent distinguishes three types of physician opinions: (1) those written by physicians who treat the claimant (treating physicians); (2) those written by physicians who only examine the claimant (examining physicians); and (3) those written by physicians who neither treat nor examine the claimant (non-examining physicians). *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). Generally, a treating physician's opinion carries greater weight than that of an examining physician, and an examining physician's opinion carries greater

9

weight than that of a non-examining physician. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2011). An ALJ must provide "clear and convincing reasons that are supported by substantial evidence" to reject uncontradicted opinions of a treating or examining doctor. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). Contradicted opinions of a treating or examining doctor may be rejected by "specific and legitimate reasons that are supported by substantial evidence." *Id.*

Plaintiff argues that the ALJ erred by according great weight to Dr. Gaeta's opinion and only partial weight to Dr. Khong's opinion. *See* Dkt. No. 23 at 8–9. According to Plaintiff, the ALJ should not have given Dr. Gaeta's opinion greater weight because Dr. Gaeta relied on an incomplete record. *See id.* at 8. Both Drs. Gaeta and Khong were non-examining physicians, so neither opinion is entitled to presumptively greater weight. *Cf. Holohan*, 246 F.3d at 1202 (describing presumptive weight of medical opinions).

The ALJ did not err by favoring Dr. Gaeta's opinion over Dr. Khong's opinion. First, the ALJ gave specific reasons for favoring Dr. Gaeta's opinion. The ALJ cited multiple normal examinations, such as two physical exams in March 2016 and 2017 which showed full strength in all of Plaintiff's extremities, as supportive of Dr. Gaeta's opinion. *See id.* at 19, 21. Dr. Gaeta's opinion was also supported by Dr. Rho's June 2016 neurological exam. *See id.* at 20. Dr. Rho opined that Plaintiff's pain likely resulted from "constant re-injury from diabetes," which was exacerbated by Plaintiff's own failure to regularly check her blood sugar. *Id.* at 20–21. The ALJ also noted "multiple instances of non-compliance with recommended treatment," including (1) Plaintiff's discharge from physical therapy in 2015 for non-compliance with the attendance policy; and (2) her failure to take the proper amount of Gabapentin as prescribed. *Id.* at 19. Because the ALJ gave specific reasons based in the medical record, the ALJ did not err. *See Carmickle*, 533 F.3d at 1164 ("The ALJ is responsible for resolving conflicts in the medical record.").

Next, Plaintiff's argument that Dr. Gaeta's opinion should not have been given greater weight because Dr. Gaeta failed to rely on Exhibit 6F, a collection of medical

10

records from Santa Clara Valley Medical Center, is not persuasive. *See* Dkt. No. 23 at 8. Notably, Dr. Khong *also* made his recommendation without considering Exhibit 6F. Dr. Khong's report was dated February 2016, but Exhibit 6F includes medical reports from between June 22, 2016 and July 6, 2017. AR 78, 532. Moreover, though Dr. Gaeta did not have Exhibit 6F before him, the ALJ read excerpts from the exhibit to him at the hearing. *Id.* at 44–49. And, when given the opportunity, Plaintiff's counsel did not request that the ALJ present any additional portions of Exhibit 6F to Dr. Gaeta. *Id.* at 49.

Because the ALJ gave specific reasons supported by the record for favoring Dr. Gaeta's opinion over Dr. Khong's opinion, the ALJ did not err.

### B. Whether the ALJ Improperly Rejected Plaintiff's Testimony

When assessing a disability claimant's testimony regarding the subjective intensity of symptoms, an ALJ must engage in a two-step analysis. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first "determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). If the claimant has presented evidence of an underlying impairment and there is no affirmative evidence of malingering, the ALJ must give "specific, clear and convincing reasons" to reject the claimant's testimony about the severity of his symptoms. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation marks omitted).

Here, the ALJ found that Plaintiff's impairments could reasonably produce her

symptoms, but not at the severity she alleged. *See* AR 19. Plaintiff argues that the ALJ did "not provide[] clear and convincing reasons supported by evidence in the record to support the credibility determination." *See* Dkt. No. 23 at 10. In particular, Plaintiff argues the ALJ erred by not exploring whether Plaintiff's non-compliance resulted from homelessness or poverty. *See id*. Further, Plaintiff argues the ALJ did not specify his reasons for "discounting Plaintiff's testimony regarding her difficulty using her hands for handling and fingering activity." *See id*.

In his opinion, the ALJ discounted Plaintiff's testimony regarding the severity of her symptoms. *See* AR at 19, 22. Although the ALJ's discussion of Plaintiff's testimony is particularly brief, he did not commit reversible error because his "path may reasonably be determined." *Brown-Hunter*, 806 F.3d at 493 (quoting *Treichler*, 775 F.3d at 1099).

The ALJ first cited Plaintiff's failure to comply with her prescribed medication. *See* AR at 19. Plaintiff argues that the ALJ failed to consider whether her failure was due to an inability to obtain appropriate treatment or medication. *See* Dkt. No. 23 at 10 (citing *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). But the record showed that Plaintiff could obtain her medication and simply failed to comply with the prescribed dosage. *See* AR at 339, 550–51.

Next, the ALJ cited Plaintiff's medical exams—some of which showed unsteady gait, but most of which showed normal gait and good strength in her extremities. *Id.* For example, the ALJ cited Plaintiff's March 29, 2016, visit to the emergency room with complaints of shortness of breath and unsteady gait. *Id.* at 20. During that visit, however, Plaintiff received mixed diagnoses of unsteady and normal gait. *Id.* at 20, 431. By the time she was discharged, her physicians noted that she was able to walk well. *Id.* The ALJ also pointed to Plaintiff's November 2016 and July 2017 examinations, which similarly found no disabling issues with her neuropathy. *Id.* at 21.

In short, although the ALJ should have more clearly identified what testimony was not credible, his focus on specific parts of the medical record contradicting Plaintiff's testimony supports his decision.

12

**C. Whether the ALJ Improperly Rejected Lay Witness Testimony**

Plaintiff also argues the ALJ erred by failing to either mention Wiley's testimony in his decision or give reasons for discounting it. *See* Dkt. No. 23 at 12. Indeed, the ALJ does not even reference Wiley's testimony in his opinion. AR 15–24. This error, however, was harmless.

"Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony . . . the ALJ's failure to discuss the lay witness testimony [is not] prejudicial per se." *Molina*, 674 F.3d 1104. As in *Molina*, Wiley's written testimony did not describe any limitation not already described by Plaintiff herself. The ALJ's reasons for rejecting Plaintiff's own testimony apply with equal force to Wiley's testimony. Thus, the ALJ's failure to address Wiley's testimony was harmless.

**IV. Conclusion**

Because the ALJ's finding of no disability is supported by substantial evidence, the Court DENIES Plaintiff's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: July 10, 2019  _____
NATHANAEL M. COUSINS
United States Magistrate Judge